**CSX TRANSPORTATION, INC., et al., Plaintiffs,**

v.

**The PUBLIC UTILITIES COMMISSION OF OHIO, et al., Defendants.**

**No. C2–88–1023.**

United States District Court, S.D. Ohio, E.D.

Dec. 12, 1988.

Patrick J. Smith, Robert W. Trafford, Janet J. Henry, Kathleen M. O'Malley, Samuel H. Porter, Porter, Wright, Morris & Arthur, Columbus, Ohio, for plaintiffs.

Sally J. Kircher, Jacksonville, Fla., for plaintiff, CSX Transp., Inc.

John R. Jenchura, Philadelphia, Pa., for plaintiff, Consolidated Rail Corp.

A. Gayle Jordan, Norfolk, Va., for plaintiff Norfolk and Western Ry. Co.

Mary P. Sclawy, Detroit, Mich., for plaintiff Grand Trunk Western Ry. Co.

Anthony J. Celebrezze, Jr., Atty. Gen. of Ohio, and Robert S. Tongren and James B. Gaines, Asst. Attys. Gen., Public Utilities Section, Columbus, Ohio, for defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

In 1970 Congress enacted the Federal Railroad Safety Act (FRSA), 45 U.S.C. § 421 *et seq.* which authorized the Secretary of the Department of Transportation to adopt railroad safety regulations. Congress included in the act broad preemption provisions excluding the states from legislating in any area of railroad safety already covered by regulations adopted by the Secretary. In 1974 Congress enacted the Hazardous Materials Transportation Act (HMTA), 49 U.S.C.App. § 1801 *et seq.* authorizing the Secretary to adopt rules and regulations governing the transportation of hazardous materials by any mode of transportation. The preemption provisions of the HMTA permit the states to adopt and enforce their own laws and rules regulating the transportation of hazardous materials so long as they are not inconsistent with federal rules adopted under the HMTA. This case presents the question of whether state legislation regulating the transportation of hazardous materials by rail is governed by the strict preemption provisions of the FRSA or by the more liberal preemption provisions of the HMTA.

The State of Ohio has recently passed legislation incorporating into Ohio law the federal regulations adopted by the Secretary of Transportation under the HMTA relating to the transportation of hazardous materials by rail. *See* Ohio Rev.Code § 4907.64 (effective September 26, 1988) (authorizing the Public Utilities Commission of Ohio (PUCO) to adopt railroad safety laws "consistent with, and equivalent in scope, coverage, and content to, the provisions of the [HMTA], and regulations adopted under it."); Ohio Admin.Code § 4901:3–1–10 (effective December 10, 1988) (adopting the provisions of the HMTA regulations contained in 49 C.F.R. §§ 171–179 governing the transportation of hazardous materials by rail). Ohio seeks to enforce these rules against railroads

through its own system of enforcement, which includes civil penalties. *See* Ohio Rev.Code § 4905.83; Ohio Admin.Code §§ 4902:2–7–01 through 4901:2–7–22.

This legislation resulted from a study of state and federal hazardous materials regulation, enforcement and emergency response conducted by a group of state agencies collectively known as the Ohio Hazardous Substances Emergency Team (OHSET) which was formed in response to the July, 1986 disaster in Miamisburg, Ohio when a number of railroad cars operated by plaintiff CSX Transportation, Inc., derailed near Miamisburg, Ohio. A rail car containing phosphorous ignited and burned, spreading a cloud of toxic gas throughout the area and forcing the evacuation of 40,000 citizens. The Ohio act reflects the judgment of the executive and legislative branches of state government that federal enforcement of regulations governing hazardous materials transported by rail is inadequate.

Plaintiffs are four major railroads engaged in interstate rail transportation in and through Ohio who challenge the constitutionality of the newly enacted Ohio statutes and administrative regulations. Defendants are the PUCO, its chairman and commissioners. Plaintiffs challenge the Ohio statutes and regulations on the grounds that they violate the Supremacy Clause of the United States Constitution, the preemption provisions of the FRSA and the HMTA and on the further grounds that they impose an undue burden on interstate commerce. The matter is now before the Court on the plaintiffs' motion for summary judgment and the defendants' cross motion for summary judgment. In their motions, the parties seek summary judgment on the issue of federal preemption.

The United States Supreme Court has recently summarized the various tests enunciated for determining whether federal law has preempted state legislation:

The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones v.*

*Rath Packing Co.,* 430 U.S. 519, [97 S.Ct. 1305, 51 L.Ed.2d 604] (1977), when there is outright or actual conflict between federal and state law, *e.g., Free v. Bland,* 369 U.S. 663, [82 S.Ct. 1089, 8 L.Ed.2d 180] (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132 [83 S.Ct. 1210, 10 L.Ed.2d 248] (1963), where there is implicit in federal law a barrier to state regulation, *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85 [, 103 S.Ct. 2890, 77 L.Ed.2d 490] (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 [67 S.Ct. 1146, 91 L.Ed. 1447] (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz,* 312 U.S. 52 [, 61 S.Ct. 399, 85 L.Ed. 581] (1941). Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation. *Fidelity Federal Savings & Loan Assn. v. De la Cuesta,* 458 U.S. 141 [, 102 S.Ct. 3014, 73 L.Ed.2d 664] (1982); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691 [, 104 S.Ct. 2694, 81 L.Ed.2d 580] (1984).

*Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 358–369, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986).

At the heart of each of these standards is the discernment of the true purpose of Congress. "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *Louisiana Public Service Commission,* 476 U.S. at 369, 106 S.Ct. at 1899.

The stated purpose of the FRSA is "to promote safety in all areas of railroad operations." 45 U.S.C. § 421. The Act requires the Secretary of Transportation to prescribe appropriate rules, regulations, orders and standards for all areas of railroad

safety and to conduct research, development, testing, evaluation and training in all areas of railroad safety. In 45 U.S.C. § 434 Congress declared its intention that laws, rules, regulations, orders and standards relating to railroad safety should be nationally uniform to the extent practicable. The statute reads as follows:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

Thus, under 45 U.S.C. § 434, a state may legislate in areas relating to railroad safety only until such time as the Secretary has adopted a rule, regulation, order or standard covering the same subject matter. A state, within limitations, may adopt an additional or more stringent rule only when necessary to address a local safety hazard. This exception does not apply to this case.

The FRSA, however, does contemplate a limited state role in enforcement. Title 45, U.S.C. § 435 provides that a state may participate in investigation and surveillance in connection with any rule or standard prescribed by the Secretary under the FRSA pursuant to certification provisions contained in the statute. The section provides, however, that "the Secretary shall retain the exclusive authority to assess and compromise penalties ... for the violation of rules, regulations, orders, and standards prescribed by the Secretary" under the FRSA.

The stated purpose of the HMTA is "to improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." 49 U.S.C. App. § 1801. The Act authorizes the Secretary to issue regulations for the safe transportation of hazardous materials which "shall be applicable to any person who transports ... a hazardous material." 49 U.S.C.App. § 1804(a). The Act authorizes the Secretary to issue regulations governing not only the transportation of hazardous materials, but also their handling and the manufacture, repair and testing of the containers in which they are transported. 49 U.S.C.App. §§ 1804, 1805.

In 49 U.S.C.App. § 1811, Congress provided for preemption of state laws on the subjects covered by the HMTA only when they are inconsistent with the Act or regulations adopted pursuant to it.

> (a) Except as provided in subsection (b) of this section, any requirement, of a State or political subdivision thereof, which is inconsistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is preempted.

Section 49 U.S.C.App. § 1811(b) provides a procedure whereby a state may request the Secretary of Transportation to make an administrative determination whether or not a state requirement is inconsistent with the HMTA or a regulation adopted pursuant to it. The Secretary has delegated this authority to the Office of Hazardous Materials Transportation, Research and Special Programs Administration (RSPA), 49 C.F.R. § 107.201 *et seq.*

Acting pursuant to the HMTA, the Secretary has adopted a body of regulations defining hazardous materials, establishing requirements for the containers they are transported in, and regulating their transportation by any mode, including air, water, rail and highway. These regulations are known as the Hazardous Materials Rules (HMR) and they are found at 49 C.F.R. §§ 171–179. The HMR's which re-

late specifically to railroads are found at 49 C.F.R. § 174.

Plaintiffs contend that this case is controlled by the broad preemption provisions of FRSA and that Congress intended to preclude state regulation of the transportation of hazardous materials by rail. Plaintiffs argue that regulations relating to the transportation of hazardous materials by rail are regulations "relating to railroad safety" within the meaning of 45 U.S.C. § 434 and that the states are precluded thereby from adopting or enforcing dual standards which relate to the transportation of hazardous materials by rail. Defendants contend, on the other hand, that Congress intended that the FRSA and its preemption provisions should apply only to general railroad safety regulations pertaining essentially to equipment, track and operating procedures whereas Congress addressed the subject of hazardous materials in the HMTA and intended that its preemption provisions should apply to such regulations.

It is clear that when Congress enacted the FRSA in 1970 it addressed not only general rail safety but also specifically addressed the transportation of hazardous materials.

The Congress declares that the purpose of this Chapter [FRSA] is to promote safety in all areas of railroad operations ... *and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials.*

45 U.S.C. § 421 (emphasis added). There is no dichotomy, as defendants suggest, between the FRSA and the HMTA, with the former limited to general railroad safety and the latter directed specifically toward the intermodal regulation of the transportation of hazardous materials. Indeed the regulation of the transportation of hazardous materials by rail is inextricably intertwined with the regulation of railroad equipment and operating procedures.

The legislative history of the FRSA evidences a clear Congressional intent that rail safety regulations be nationally uniform and that all enforcement should be by federal authorities.

With the exception of industrial or plant railroads, the railroad industry has very few local characteristics. Rather, in terms of its operations, it has a truly interstate character calling for a uniform body of regulations and enforcement. It is a national system. ... In addition to the obvious areas of rolling stock and employees, such elements as operating rules, signal systems, power supply systems, and communication systems of a single company normally cross many State lines. To subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce.

H.R.Rep. No. 1194, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4104, 4110–4111.

The Committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems. Accordingly, while it has preserved the framework of certification, it has modified the concept insofar as it applies to the nation's rail system to make all enforcement Federal in nature. The Secretary will have exclusive authority to assess and compromise penalties and to recommend court action for recovery of such penalties ... [States] will have no authority to assess and compromise penalties or to seek State judicial action.

*Id.* at 4109.

The scope of preemption under the FRSA has been broadly construed by the courts. *See National Association of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11 (3d Cir.1976); *Chesapeake & Ohio Railway Co. v. City of Bridgman,* 669 F.Supp. 823, 825 (W.D.Mich.1987); *Consolidated Rail Corp. v. Pennsylvania Public Utility Commission,* 536 F.Supp. 653 (E.D. Pa.), *aff'd mem.,* 696 F.2d 981 (3rd Cir. 1982), *aff'd mem.* 461 U.S. 912, 103 S.Ct.

1888, 77 L.Ed.2d 280 (1983); *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 671 F.Supp. 466 (W.D.Tex. 1987), *aff'd*, 850 F.2d 264 (5th Cir.1988).

As noted above, the preemption clause of the FRSA provides in part as follows:

A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement.

45 U.S.C. § 434. A central issue in this case is the meaning of the phrase "any law, rule, regulation, order or standard relating to railroad safety." The key components of the phrase are: *"any* law, etc.," *"relating* to," "railroad *safety."* These are words of broad meaning and in ordinary usage they would certainly include rules relating to the transportation of hazardous materials by rail. Defendants have a heavy burden to show that the phrase should be interpreted so as to exclude such rules.

The legislative history of FRSA indicates that Congress intended the phrase, "relating to railroad safety," as used in 45 U.S.C. § 434, to include intermodal safety regulations insofar as they apply to rail transport. For instance, Congress included in a list of "existing railroad safety laws" the Explosives and Other Dangerous Articles Act, a predecessor of the HMTA which provided for intermodal regulation of the transportation of hazardous materials. H.R.Rep. No. 1194, 91st Cong., 2d Sess. (Appendix B).

In 1980 when Congress defined the term "railroad safety laws" in the context of a "whistle blower" statute, the definition expressly included the HMTA. *See* 45 U.S.C. § 441(e). The statutes listed in this section are the same statutes set forth in the list mentioned in the preceding paragraph, except for the substitution of the HMTA for the Explosives Act.

The legislative history of the FRSA shows that the issue of federal preemption was vigorously debated, leaving a clear record of Congressional intent for virtually complete federal preemption in the area of railroad safety laws. The legislative history of HMTA, which was enacted just four years later, is devoid of any debate or discussion on the standard of preemption applicable to rules which regulate the transportation of hazardous materials by rail.

Representative Springer observed during the hearings on FRSA:

*I think this [preemption] is the great area or problem,* Mr. Secretary, where there would be a possibility, this is just opinion, but I think I can read that this would be the area probably where we might have the most agreement or disagreement about what ought to be done. *I think this is really what the turning point of the bill will be, in my opinion.*

*Hearings Before the Subcommittee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce*, 91st Cong., 2d Sess. 43 (1970) (emphasis added).

Representative Kuykendall made the following comment:

Yes. Mr. Reed, I think you have gathered—I know you were here this morning and heard the testimony and probably at least had representatives at some of the other sessions. There is not much disagreement with this bill and *it seems to me that almost the entire area of disagreement has now been pretty well isolated.* Disagreeing with your position on the overall goals of this bill would be just like disagreeing with God and motherhood. You just don't do it. *So let's get to the area of discussion of what we are faced with, the problem of preemption and authority of the different levels of regulatory agencies.*

*See id.* at 141 (emphasis added).

It would certainly seem that if Congress had intended rail safety regulations adopted under the HMTA to be subject to a different standard than the one so recently and vigorously debated during the adoption of the FRSA, then the legislative history would reflect such a decision. The absence of debate or comment on the issue of preemption of railroad regulations in the legislative history of the HMTA leads to the

conclusion that in enacting the HMTA Congress must have intended that any rail safety regulations adopted pursuant to it would fall under the same preemption standard already established for all rail safety regulations under the FRSA.

■■■■ Defendants are unable to point to any specific provision of the HMTA which negates the express preemption provisions of the FRSA. Defendants' argument is based upon an implied repeal of the preemption provisions of the FRSA by the more liberal preemption provisions of the HMTA. The implied repeal of an earlier statute by the mere enactment of a later, even potentially conflicting one, is disfavored and should be avoided whenever possible. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1013, 104 S.Ct. 2862, 2878, 81 L.Ed.2d 815 (1984); *TVA v. Hill,* 437 U.S. 153, 189–190, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978); *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168–169, 96 S.Ct. 1319, 1322–23, 47 L.Ed.2d 653 (1976); *Davis v. Devine,* 736 F.2d 1108, 1114 (6th Cir.), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 436, 83 L.Ed.2d 362 (1984). Here, the most logical way to resolve any conflict is to give effect to the specific preemption language of the FRSA (which by its literal language applies to all rail safety regulations adopted by the Secretary) while applying the more liberal preemption standard of the HMTA to regulations adopted with respect to other modes of transportation.

Defendants point out that the HMTA transferred regulatory authority over hazardous materials transportation from the Federal Railroad Administration (FRA) to the Secretary of the Department of Transportation and argue that this signifies a Congressional intent that such regulations should not be governed by the preemption provisions of the FRSA. Defendants overlook the fact that the preemption provisions of the FRSA apply to rail safety measures adopted by the Secretary, not the FRA. By transferring hazardous materials regulation from the FRA to the Secretary, Congress did not in any way separate railroad safety regulation from hazardous materials

regulation, rather, the Secretary is responsible for both. Indeed, as noted, the FRSA preemption provision is tied to railroad safety regulations adopted by the Secretary, not by the FRA. Defendants' argument would make sense only if FRSA preemption was in fact tied to regulations adopted by the FRA and plainly it is not.

Every court which has specifically addressed the question has held that the preemption standards of the FRSA apply to regulations adopted by the Secretary under the HMTA. *See Atchison, Topeka & Santa Fe Railway Company v. Illinois Commerce Commission,* 453 F.Supp. 920 (N.D. Ill.1977); *Missouri Pacific Railroad Co. v. Railroad Commission of Texas,* 671 F.Supp. 466 (W.D.Tex.1987), *aff'd,* 850 F.2d 264 (5th Cir.1988) (affirmed solely on FRSA preemption; Fifth Circuit found it unnecessary to rule on HMTA preemption issue); *CSX Transportation, Inc. v. City of Tullahoma,* Case No. CIV4–87–47, Slip Op. at 11, —— F.Supp. —— (E.D.Tenn. Feb. 17, 1988). In *Atchison,* at 924, the court said:

> However, these statutes do not require the overly technical interpretation which would subject orders and regulations issued by the Secretary under one law to a different preemption standard than those under another. [FRSA and HMTA] The Railroad Safety Act of 1970 provides that state action is preempted when the Secretary has issued orders or regulations covering the field. This is not limited merely to those promulgated under that Act, but refers instead to any action taken by the Secretary....

> Any more narrow interpretation of the Railroad Safety Act would frustrate its stated purpose of establishing uniform national standards.

Similarly in *Missouri Pacific,* the court said:

> Section 434 refers to acts by "the Secretary," referring to the Secretary of Transportation, and does not confine itself to acts pursuant to the FRSA. Thus, an act by the Secretary pursuant to, for example, the HMTA could

preempt state law under the terms of section 434.

671 F.Supp. at 471 n. 1.

And finally, in *CSX Transportation*, at 11, the court held:

1. Transportation of hazardous material is regulated by the Secretary of Transportation under both the HMTA and the FRSA. Although the preemption standard is somewhat different under the two acts, under the FRSA, state action is preempted when the Secretary has issued orders or regulations covering the field. Preemption is not limited to those regulations promulgated under the FRSA, but refer instead to any other rule, regulation, order, or standard covering the subject matter and adopted by the Secretary.

The legislative history of Congressional actions taken since the enactment of the HMTA reinforce the conclusion that Congress intended the preemption provisions of FRSA to apply to regulations adopted under the HMTA insofar as they apply to rail transport. During a joint hearing before the House of Representatives in 1979, the House Committee submitted written questions to the Department of Transportation about state involvement in the regulation of transportation of hazardous materials. The answers were given by the director of RSPA and included a discussion of the differing preemption standards of the FRSA and the HMTA:

The preemption provisions of the Hazardous Materials Transportation Act operate to preempt any State or local requirement that is "inconsistent" with the Federal regulations. Unless it is "inconsistent," a State or local requirement is *not* preempted. *In the case of a State or local restriction directed at rail transport, there is a second Federal statutory provision that acts to further limit the legal authority of States and localities. Under the Railroad Safety Act,* a State or locality is expressly preempted from any "additional or more stringent" rail safety requirement unless it is "necessary to eliminate or reduce a local safety hazard."

*Hazardous Materials Transportation Act Amendments: Joint Hearing Before the Subcommittee on Surface Transportation and Subcommittee on Aviation of the Committee on Public Works and Transportation on H.R. 3502,* 96th Cong., 1st Sess. 33 (1979) (emphasis added in part).

This statement was made in the context of hearings with respect to appropriations for enforcement of the HMTA and in response to specific questions by the Congressional Subcommittee relating to the role of the states in the regulation of the transportation of hazardous materials. Viewed in this context, it is a clear statement to Congress that the Department of Transportation interprets the preemption provisions of the FRSA to apply to hazardous materials regulations adopted under the HMTA. Although amendments have been made to both the FRSA and the HMTA since that time, none of them have changed the preemption provisions of either statute.

Likewise, Congress has taken no action to overturn the decision of the District Court for The Northern District of Illinois in *Atchison, Topeka & Santa Fe Railway Company v. Illinois Commerce Commission,* 453 F.Supp. 920 (N.D.Ill.1977) The United States was an intervening plaintiff in *Atchison* and there was no appeal from the district court's decision. As noted above, the *Atchison* court held that the preemption provisions of FRSA apply to regulations adopted under the HMTA. "Congress is deemed to know the executive and judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." *Florida National Guard v. Federal Labor Relations Authority,* 699 F.2d 1082, 1087 (11th Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983), *citing Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed. 2d 40 (1978), and *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975).

Congress's failure to amend the FRSA or the HMTA preemption provisions in response to either the *Atchison* decision or

RSPA's position in its response to the House Committee in May of 1979 can be read as acceptance of those interpretations. Indeed Congress's Office of Technology Assessment has accepted this interpretation in a report entitled *Transportation of Hazardous Materials*, OTA–SET–304 (Washington, D.C.; U.S. Government Printing Office, July 1986). In the context of a discussion of a federally financed program for training state inspectors, this comment appears at page 213 of the report:

> Even where State inspectors have been trained in rail safety procedures, they cannot conduct hazardous materials inspections, because authority to do so has not been granted to States.

The author of the report attributed this interpretation to the FRA. *See* Defendants' Motion for Leave to File Supplement to Prior Affidavit or to File Supplemental Pleading, Docket 26.

Defendants further argue that Congress's treatment of the role of the states in surveillance and inspection under the FRSA demonstrates its intent that regulation of the transportation of hazardous materials by rail should be governed by the preemption standards of the HMTA.

When the HMTA was enacted in 1974, Congress also amended the FRSA. The legislative history indicates Congressional displeasure with the performance of the FRA.

> The Committee found that after three and one half years, the FRA inspection of rail equipment and plant seems to be a stepchild of the Department's low key safety approach. by April 1974, the FRA had only 12 track inspectors for over 300,000 miles of rail track, 16 signal and train control inspectors, and only 50 inspectors for more than 1.7 million freight cars and 25,000 locomotives. There were only 8 inspectors for hazardous materials. When questioned about bridges and tunnels, the FRA witness revealed his department had only one bridge and tunnel expert in Washington, and yet he stated that there were 192,000 bridges. Many of these bridges are old, and one, which crosses the Mississippi

River, was first opened in 1856 and is still in operation today.

H.R.Rep. No. 1083, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7669, 7672.

Congress also criticized the FRA's delay in implementing provisions designed to involve the states in the enforcement of safety regulations within the scope of FRSA, as authorized by 45 U.S.C. § 435. *Id.* at 7673. Congress responded to these concerns by increasing the appropriations to administer the FRSA and requiring that a greater percentage of such appropriations be directed to enforcement activities. Transportation Safety Act of 1974, 1974 U.S.Code Cong. & Admin.News 7669 *et seq.* (codified as amended at 45 U.S.C. § 444).

In 1980 Congress again amended the state participation program under FRSA. Federal Railroad Safety Authorization Act of 1980, Pub.L. No. 96–423, 1980 U.S.Code Cong. & Admin.News (94 Stat.) 1811 (amending 45 U.S.C. §§ 431–443). This amendment expanded the scope of state participation under the inspection and surveillance provisions of FRSA, 45 U.S.C. § 435, but specifically excluded the HMTA from this program. Defendants argue that this indicates Congress's intention that the regulation of the transportation of hazardous materials by rail should be subject to the preemption provisions of the HMTA, otherwise the exclusion of the HMTA from the state certified inspection and surveillance provisions of FRSA would exclude the states from any role whatsoever in the enforcement of regulations regarding the transportation of hazardous materials by rail. Defendants argue that it would not be logical for Congress to have excluded the states from any role in this important area when it included them in the enforcement of other areas of railroad safety.

The Court agrees that it may have been logical or even desirable for Congress to have provided a meaningful state role in regulating the transportation of hazardous materials by rail. However, the issue before the Court is not the wisdom of the Congressional enactments, but what Congress intended. Based upon a considered

analysis of the statutory language and the legislative history, the Court is satisfied that Congress intended that the strict preemption provisions of the FRSA apply to hazardous materials regulations applicable to railroads adopted under the HMTA. This means that the only role of the states in the regulation of the transportation of hazardous materials by rail is that narrow role permitted by the preemption provisions of the FRSA.

Defendants cite a decision of the District Court of Nevada in the case of *Southern Pacific Transportation Co. v. Public Service Commission of Nevada*, No. CV-N-86-444-BRT Slip Op. (D.Nev. Sept. 28, 1988) (attached as Appendix G to Defendants' Cross Motion For Partial Summary Judgment, Docket 16) and Inconsistency Ruling IR-19, 52 Fed.Reg. 24404, 24410, 24411 (1987), *aff'd* 53 Fed.Reg. 11600 (1988) (attached as Appendix F, Defendants' Cross Motion For Partial Summary Judgment, Docket 16).

In its brief opinion in *Southern Pacific Transportation*, the District Court for the District of Nevada upheld regulations of the Public Service Commission of Nevada which governed the temporary storage of hazardous materials on railroad property. The Court found that the federal regulations did not address the manner of storage of hazardous materials and that there was no inconsistency between the Nevada regulations and the federal regulations. The court considered only the preemption provisions of the HMTA. No mention was made of the preemption provisions of the FRSA, thus it appears that the central issue in the present case was neither presented to, nor decided by the Nevada District Court.

Nor did the RSPA inconsistency ruling cited by defendants address the issue presented by the present case. By law RSPA is limited to a consideration of inconsistency under the preemption standards of the HMTA. RSPA inconsistency rulings contain an explicit acknowledgment of this limitation upon its decision making:

Since these proceedings are conducted pursuant to the HMTA, *only* the question of statutory preemption *under the HMTA will be considered. A Federal court might find a non-Federal requirement statutorily preempted under another statute.*

See, e.g., Inconsistency Ruling IR-19, 52 Fed.Reg. 24404, 24405 (1987), *aff'd*, 53 Fed. Reg. 11600 (1988) (emphasis added). *See also* 49 C.F.R. § 107.209. The statement in this RSPA ruling that "RSPA encourages states to adopt and enforce the HMR as state requirements" does not relate to railroads. Rather, it is based on another RSPA ruling dealing with highway vehicles, an area in which RSPA has indeed encouraged an active state role. *See* IR-17, 51 Fed.Reg. at 20931.

Finally, although defendants assert that at least 12 other states have adopted the federal HMR as state requirements applied to railroads, there is no evidence that such statutes are being enforced, that their constitutionality has been tested or that Congress or the Department of Transportation has in any way sanctioned their existence.

Ohio has attempted to do precisely that which Congress sought to prohibit. Ohio Rev.Code §§ 4907.64 and 4905.83 grant to the PUCO the authority to establish both a statewide system of railroad safety standards that duplicate the regulations adopted by the Secretary of Transportation under the HMTA and a procedure for enforcement of those standards by the PUCO, including the imposition of forfeitures of up to $10,000.00 for each day of each violation. The Ohio statutes and administrative regulations fall squarely within the preemption provisions of the FRSA because the Secretary of Transportation has adopted rules and regulations covering the same subject matter.

Plaintiffs' Motion For Partial Summary Judgment is well taken. Ohio Rev.Code §§ 4905.83 and 4907.64 and Ohio Admin. Code §§ 4901:2-7-1 through 4901:2-7-22 and 4901:3-1-10 are preempted by the Federal Railroad Safety Act of 1970 and plaintiffs are entitled to an order enjoining defendants from enforcing such provisions.

■ By this opinion and order the Court has resolved plaintiffs' claims that the Ohio statutes and administrative regulations at

618

issue are preempted by the FRSA. However, the Court has not addressed plaintiffs' claims that the statutes and administrative regulations are preempted by the HMTA or that they violate the Commerce Clause because they impose an undue burden on interstate commerce. Nevertheless, the Court determines pursuant to Fed.R. Civ.P. 54(b) that there is no just reason for delay in entering final judgment for the plaintiffs granting the relief demanded in the complaint. In making this determination the Court has considered the following factors: The Court's finding on the issue of preemption under the FRSA is completely dispositive of this action; a determination of the remaining claims, particularly the claim that the Ohio statutes and rules impose an undue burden on interstate commerce, will require an evidentiary hearing and an extensive and complicated analysis of the facts and law which will be unnecessary if the case can be decided solely on the preemption issue; the claim of FRSA preemption is entirely separate and distinct from the remaining claims and there is no possibility that the reviewing court could be required to consider the same issue a second time; the interests of judicial economy will be served by an immediate appeal and the parties may be spared the expense of litigating moot issues; finally, both sides in this controversy, as well as the citizens of Ohio, have a legitimate interest in a prompt determination of the important issues presented by this case which may well be facilitated by an immediate appeal.

Plaintiffs' Motion For Partial Summary Judgment is granted. Defendants' Cross Motion For Partial Summary judgment is denied. The Clerk shall enter final judgment in favor of the plaintiffs, permanently enjoining the defendants from enforcing Ohio Rev.Code §§ 4905.83 and 4907.64 and Ohio Admin.Code §§ 4901:2-7-1 through 4901:2-7-22 and 4901:3-1-10.

It is so ORDERED.